**Reverend Willie B. YOUNG, as Personal Representative of the ESTATE OF Roscoe YOUNG, Decedent, Plaintiff–Appellee,**

v.

**Bill MARTIN, et al., Defendant–Appellant.**

**No. 02–1036.**

United States Court of Appeals, Sixth Circuit.

Oct. 21, 2002.

Before KRUPANSKY and CLAY, Circuit Judges; GWIN, District Judge *.

---

* The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

CLAY, Circuit Judge.

Defendant Bill Martin, former director of the Michigan Department of Corrections ("MDOC"), appeals the district court's (1) order denying his motion for summary judgment, and (2) order denying his motion for rehearing and reconsideration.[1] In his summary judgment motion, Defendant Martin sought qualified immunity as to claims brought under 42 U.S.C. § 1983 by Plaintiff, Reverend Willie B. Young, as personal representative of the Estate of Roscoe Young ("decedent"). Plaintiff, decedent's father, alleges that Defendant Martin implemented a policy that denied necessary and life-saving medical care to prisoners such as decedent. Defendant Martin contends that the district court erred in denying his motion for summary judgment based on qualified immunity. For the reasons that follow, we **AFFIRM** the orders of the district court.

## BACKGROUND

### Procedural History

Plaintiff filed the instant action on July 9, 2001 pursuant to 42 U.S.C. § 1983.[2] Plaintiff alleged in his complaint that Defendant Martin, as well as David Jamrog, warden of the Adrian Temporary Correctional Facility, and two John Does (collectively "Defendants"), violated decedent's Eighth Amendment rights against cruel and unusual punishment by demonstrating indifference to decedent's serious medical needs. The complaint requested compensatory, exemplary, and punitive damages.

Defendants subsequently moved for summary judgment, in part on the basis that Defendant Martin was entitled to qualified immunity. Defendants also moved to stay discovery pending a ruling on qualified immunity. Plaintiffs opposed both motions.

The district court entered a memorandum opinion and order on October 25, 2001, denying in part and granting in part Defendants' motion for summary judgment. It dismissed claims against Defendant Jamrog, who undisputedly was not warden at the relevant time. However, because the complaint alleges that Defendant Martin "adopted a policy regarding the authorization request procedure utilized by the correctional medical services department which discouraged the administration of necessary life saving health care to inmates," the district court allowed the Eighth Amendment claim against Defendant Martin to proceed, despite the complaint's lack of allegations of Defendant Martin's personal involvement. (J.A. at 263.) In so doing, the court ruled that the complaint stated a policy claim against Martin in his supervisory capacity. The court further granted limited discovery as to "what the policy at issue is, whether said policy violated [decedent's] constitutional rights under the Eighth Amendment, and whether Defendant Martin had knowledge that the policy had a substantial risk of serious harm." (J.A. at 266.) The district court further ordered that discovery be stayed pending any appeal. Defendant Martin filed a motion for reconsid-

1. David Jamrog and two John Does were also named as Defendants in this case, but claims on their behalf are not at issue in this appeal.

2. The statute provides in pertinent part:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be sub-jected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .
42 U.S.C. § 1983.

eration, which the district court denied. Thereafter, this timely appeal followed.

### Facts

According to the complaint, decedent was sentenced to an eight-to-fifteen year-period of imprisonment, and was incarcerated under the jurisdiction of the MDOC at the Adrian Temporary Facility ("AFT") in Adrian, Michigan, from March 1999 to November 1999. On numerous occasions decedent, who was diabetic and suffered from other maladies, went to the medical clinic at the ATF complaining of nose bleeds, dizziness, elevated blood sugar, and ulcerations on his feet and legs. Decedent's untreated ulcerations led to a staph infection, which also was not properly treated. Plaintiff also contends that decedent was denied proper administration and dosage of his insulin required to control his diabetes.

In his affidavit, Plaintiff contends that decedent contacted him once a week to complain about not getting his medications. Plaintiff states that he also informed officials at the MDOC and spoke with the warden about his son not getting the proper medical care for his condition. Despite these efforts, Plaintiff avers that decedent still called to complain about his lack of medical care and the withholding of insulin.

Decedent's medical condition worsened, and he was transferred to Dwayne Waters Hospital, a Department of Corrections facility, where he suffered acute renal failure and sepsis. An emergency nephrology consult was requested on October 14, 1999, which John Doe #2, director of the Correctional Medical Services, denied on October 18, 1999. Defendant Martin and John Doe #2 later approved the consult but scheduled an appointment for several weeks later, on November 12, 1999.

With his condition worsening, decedent was admitted to Foote Hospital in Jackson, Michigan on October 21, 1999, with multiple organ system failure and septic shock. During decedent's stay there, he underwent surgery, eventually lapsed into a coma and died on November 10, 1999, after suffering a stroke.

Plaintiff alleges that Defendant Martin adopted Policy Directive 03.04.100, which established and maintains a chronic disease data base. The policy provides that chronic care clinics will be established so that patients with chronic diseases can receive continuous health care treatment. Plaintiff contends that Defendant Martin implemented this policy to minimize the expenses of medical care provided to prisoners, knowing that there was a substantial risk that its implementation would cause serious harm to inmates. He points to Policy Directive 03.04.100, which provides in pertinent part:

### CHRONIC CARE CLINICS

FF. Chronic care clinics shall be established to ensure that prisoners with specified chronic diseases or disorders receive continuous health care services. Prisoners who are seen in chronic care clinics shall be identified on the Chronic Disease Index (CDI).

GG The CDI is a computerized health care tracking system which identifies prisoners with chronic disease. The CDI shall be used with guidelines developed by the Chief Medical Officer and the Medical Advisory Committee *to provide minimum standards of care.* A prisoner shall be placed on the CDI based upon chronic disease diagnosis.

(J.A. at 248.) (emphasis added). Plaintiff alleges that this policy resulted in decedent's death.

## DISCUSSION

A denial of qualified immunity as to a § 1983 action is reviewed *de novo*. *Klein v. Long*, 275 F.3d 544, 550 (6th Cir.2001). However, "[a] defendant who is denied qualified immunity may file an interlocutory appeal with this Court only if that appeal involves the abstract or pure legal issue of whether the facts alleged by the plaintiff constitute a violation of clearly established law." *Shehee v. Luttrell*, 199 F.3d 295, 299 (6th Cir.1999) (citation omitted). "Thus, in order for an interlocutory appeal to be appropriate, a defendant seeking qualified immunity must be willing to concede to the facts as alleged by the plaintiff and discuss only the legal issues raised by the case." *Id.* Therefore, for the purposes of this appeal, we accept Plaintiff's allegations as true and proceed to examine the legal issues.

Defendant Martin contends that he is entitled to summary judgment on the basis of qualified immunity because (1) Plaintiff's Eighth Amendment deliberate indifference claim alleges no personal involvement in decedent's care or death on Defendant's part, and (2) to the extent that Plaintiff asserts a policy and custom claim, such claims are limited to municipalities, inasmuch as no clearly established law provides that a policy or custom claim may be asserted against a state official acting in his individual capacity.

Plaintiff counters that fact questions exist which preclude a grant of summary judgment for Defendant Martin on the ground of qualified immunity. Plaintiff claims that he is entitled to discovery on his claim that Defendant Martin adopted and/or oversaw a policy that essentially discouraged the administration of necessary life-saving health care to inmates. Citing *Taylor v. Michigan Dep't of Corrs.*, 69 F.3d 76 (6th Cir.1995), Plaintiff further claims that our Circuit's precedent has held a state official liable for implementing or overseeing an unconstitutional policy, even without specific knowledge that the policy will cause harm to a particular plaintiff. We agree that Plaintiff, at this stage, should be allowed to proceed with his claim.

### 1. Personal Capacity or Official Capacity Suit

As an initial matter, Defendant Martin points out that Plaintiff's complaint does not indicate whether he is being sued in his official or personal capacity. This is relevant because the Eleventh Amendment does not bar the action where a state official is sued in a personal capacity. *Hardin v. Straub*, 954 F.2d 1193, 1198 (6th Cir.1992). Moreover, a defendant's defense of qualified immunity only applies to bar a claim in a personal capacity suit. *See Moore v. City of Harriman*, 272 F.3d 769, 772 n. 1 (6th Cir.2001) (en banc).

■ We believe that Plaintiff attempts to hold Defendant Martin personally liable for decedent's death. Although the complaint does not specify whether it is attempting to hold Defendant personally liable, we have adopted a "course of proceedings" test to determine whether a § 1983 defendant has received notice that a plaintiff intends to hold the defendant personally liable for a constitutional violation. *See Moore*, 272 F.3d at 772. This "test considers such factors as the nature of the plaintiff's claims, requests for compensatory or punitive damages, and the nature of any defenses raised in response to the complaint ...." *Id.* at 772 n. 1. Here, Plaintiff sought money damages in his complaint. Because state officials cannot be sued for money damages in their official capacities, *Lapides v. Bd. of Regents of Univ. Sys. of Georgia*, 535 U.S. 613, ——, 122 S.Ct. 1640, 1643, 152 L.Ed.2d 806 (2002), the request for money

damages indicates a personal capacity suit. Therefore, we believe that Defendant Martin clearly was on notice that Plaintiff intended to maintain a personal capacity suit against him.

## 2. Qualified Immunity

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see also Comstock v. McCrary*, 273 F.3d 693, 701 (6th Cir.2001).

In determining the qualified immunity issue, we first must consider the threshold question of whether "the facts alleged show the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (citing *Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991)). Second, we must determine whether the rights at issue have been "clearly established" not just in an abstract sense, but in a particularized sense. *Cope v. Heltsley*, 128 F.3d 452, 458 (6th Cir.1997). "[I]f the right at issue was clearly established at the time the governmental actor committed the violation in question, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow*, 457 U.S. at 818–19. Plaintiff bears the burden to allege and prove that the defendant violated a clearly established right. *Spurlock v. Satterfield*, 167 F.3d 995, 1005 (6th Cir. 1999) (citing *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir.1994)). To determine whether a right is clearly established, we have instructed district courts to look at

binding precedent from the United States Supreme Court, the Sixth Circuit, or its own court. *Cope*, 128 F.3d at 459 n. 4.

Further, "[i]n examining a claim for qualified immunity, we must balance the need for public officials to be free from the constant fear of lawsuits brought while performing their official duties, with the recognition that '[i]n situations of abuse of office, an action for damages may offer the only realistic avenue for vindication of constitutional guarantees.'" *Spurlock*, 167 F.3d at 1005 (citing *Harlow*, 457 U.S. at 814)).

The Eighth Amendment imposes a duty on officials to provide "humane conditions of confinement," including insuring, among other things, that prisoners receive adequate clothing, food and medical care. *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In order to find an Eighth Amendment violation, two conditions must be met: (1) the alleged deprivation must be objectively sufficiently serious, and (2) the prison official must have been deliberately indifferent, which encompasses the mens rea component of the claim. *Id.* at 834. Specifically, the prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

In a § 1983 action, liability cannot be premised on the doctrine of respondeat superior. *Taylor*, 69 F.3d at 80–81 (6th Cir.1995). Thus, a "mere failure to act" or "simple negligence" is insufficient. *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999). A plaintiff must show the supervisor either (1) personally engaged in the alleged constitutional violation or (2) encouraged or condoned the alleged violation of the offending subordinates. *Id.; see also Comstock*, 273 F.3d at 712–13.

Here, Plaintiff claims that Defendant Martin knowingly implemented a policy of minimizing medical care and withholding necessary care which caused Plaintiff's early demise. Therefore, Plaintiff must show that Defendant Martin either participated in the offending conduct or "at least implicitly authorized, approved, or knowingly acquiesced" in the conduct of his subordinates. *Comstock,* 273 F.3d at 713.

■ Plaintiff's complaint is devoid of any allegation of personal involvement by Defendant in the actual delivery of health care to decedent. Likewise, Defendant Martin submitted an affidavit, stating that he played no role in the day-to-day operation of the department's health service areas, and had no actual knowledge of the events described relative to Plaintiff's claims. However, the complaint does allege that Defendant Martin adopted a policy regarding the authorization request procedure used by the correctional medical services department which discouraged the administration of necessary life-saving health care to inmates. On this basis we believe that Plaintiff should proceed.

Plaintiff acknowledges his burden of showing, pursuant to *Farmer,* 511 U.S. at 837, that Defendant Martin was aware of facts from which an inference could be drawn that his conduct created a substantial risk of serious harm to decedent and that Defendant Martin drew the inference. Plaintiff points to the implementation of Policy Directive 03.04.100 as evidence that Defendant Martin was aware that prisoners such as decedent were exposed to excessive risks of harm to their health. Plaintiff then claims that Defendant Martin disregarded the excessive risk by implementing the policy which requires that prisoners receive minimal care, limits referrals, and charges prisoners for the costs of their own health care.

Plaintiff relies on two cases, *Hill v. Marshall,* 962 F.2d 1209 (6th Cir.1992), and *Taylor,* 69 F.3d 76, for support. In *Hill,* a prisoner sued the former deputy superintendent of treatment at a correctional facility, after the plaintiff complained that his medication was confiscated and that he was repeatedly denied medication. 962 F.2d at 1211. In holding that the official could be held liable in his supervisory capacity, we noted that the plaintiff did allege that defendant *personally* ignored the plaintiff's complaint that he was not receiving his medication, and that the defendant was charged with "abandoning the specific duties of his position . . . ." *Id.* at 1213. In contrast, Plaintiff here attempts to hold Defendant Martin liable for decedent's death, but fails to show at all that he in any way was personally involved with decedent's care. While it is true, as Plaintiff contends that a prison official may be held personally liable for actions he took in the course of his office, this does not mean that Plaintiff may prevail absent allegations or proof of personal involvement or implicit condonation of subordinates' actions. Therefore, we do not find this case dispositive of the issue.

However, we do believe that *Taylor* supports Plaintiff's position. In *Taylor,* a plaintiff sued a warden of a penal camp, where the prisoner had been raped. 69 F.3d at 77. The prisoner contended, among other things, that the warden knew about the risk of sexual assault at the camp but failed to implement a policy to identify and screen out transferees to the camp, such as the plaintiff, who would not be safe at the camp. We held that the plaintiff had submitted sufficient evidence to create a triable issue of fact as to "whether Warden Foltz knew that conditions [at the camp] posed a substantial risk of serious harm to prisoners like plaintiff" and "whether in the face of this knowledge he acted with deliberate indifference—that

is, disregarded a risk of harm of which he was aware—by failing to adopt reasonable policies to protect inmates like Taylor." *Id.* Warden Foltz contended that he could not be held personally liable for the plaintiff's rape because he had no personal involvement in the decision to transfer him to the camp but had delegated that task to his subordinates. *Id.* at 78–79. We disagreed, finding that Foltz was directly responsible for approving transfers and adopting reasonable transfer procedures; he also could delegate the authority to sign his name on transfers, a duty he delegated to deputy wardens. *Id.* at 80, 81. We noted that Foltz's own deposition testimony revealed that his deputy wardens were redelegating the authority over transfers to lower level staff without any explicit authorization to do so. *Id.* at 80. Further, Foltz was not sure of the procedures for approving transfers and had not reviewed procedures to determine whether his authority was being abused. *Id.* We found that, similar to *Hill,* a jury could find that Foltz had a job to do and did not do it. *Id.* at 81.

Although Plaintiff does not allege that Defendant Martin was personally involved with his actual care, he does contend that Defendant Martin implemented a policy which only granted minimal care to inmates with chronic illnesses. As in *Taylor,* it does not matter that Defendant Martin did not know of the substantial risk of harm to Plaintiff in particular; rather, the inquiry is whether he was aware that his conduct would result in a substantial risk of harm to a particular class of persons. Therefore, in accordance with our precedent, we hold that qualified immunity is not warranted here. If Plaintiff can prove that Defendant, who was responsible for implementing policy for the MDOC, implemented a policy that set forth only minimal standards of health care for inmates with chronic or long-term serious illnesses knowing that in doing so he was creating a substantial risk of harm to inmates, then this would tend to show that Defendant Martin at least implicitly approved unconstitutional conduct of his subordinates, who provided the actual health care. *Id.*

We note that Plaintiff will have to come forward with proof to support his claim, and definitive proof thus far has not been forthcoming. For instance, Plaintiff points to deposition testimony of decedent's sister in which she contends that decedent told her in phone conversations before his death that unless decedent had his own money to pay for insulin, such insulin would be withheld from him by his medical caretakers at the prison facility. According to decedent's sister, when decedent's family sent him money, that money was used to buy the insulin, and when the money ran out, the insulin was unavailable. Plaintiff attributes this to the policy Defendant Martin implemented, but Plaintiff fails to point out where the policy requires an inmate to pay for his own medication. He merely states that the policy so required. Further, although the policy does appear to provide for "minimum standards of care" for prisoners with chronic diseases, there is no indication as to what this means. However, in light of the dearth of discovery conducted thus far, we recognize that more supporting evidence may be forthcoming.

Therefore, we believe the denial of qualified immunity was proper, and we will allow Plaintiff to proceed with his claim.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the orders of the district court.